## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | | |
|---|---|---|
| CONCERNED CITIZENS OF | ) | |
| WEST TENNESSEE | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **Case No. _____** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, FARM SERVICE AGENCY, | ) | |
| TOM VILSACK, in his official capacity as | ) | |
| Secretary of Agriculture, ZACH DUCHENEAUX, | ) | |
| in his official capacity as Administrator of the | ) | |
| Farm Service Agency, JOHN LITZ, in his official | ) | |
| capacity as the State Executive Director of the | ) | |
| Farm Service Agency, ANDY LEWIS, in his | ) | |
| official capacity as County Executive Director | ) | |
| of the Farm Service Agency, JON TRAVIS, in his | ) | |
| official capacity as Farm Loan Officer at the | ) | |
| Farm Service Agency, NGUYEN, LLC, | ) | |
| TRANG NGUYEN LLC, and | ) | |
| FARM CREDIT MID-AMERICA, FLCA | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     This litigation challenges the federal government's illegal practice of subsidizing industrial chicken operations through a federal lending program expressly reserved for "family farms." In addition, this litigation challenges the federal government's wrongful practice of guaranteeing loans to industrial scale chicken operations without thoroughly analyzing their environmental impacts as required by law.

2.     Industrial chicken growing operations affiliated with Tyson Foods, Inc. ("Tyson") are rapidly spreading across the landscapes and watersheds of West Tennessee. Tyson recently constructed a $425 million chicken slaughtering facility in Humboldt, Tennessee. That facility will slaughter more than 1.2 million chickens each week. In order to provide an adequate supply of chickens to that facility, Tyson needs approximately 330 industrial chicken houses, each housing 25,000 or more birds, to be constructed within a 60-mile radius of the plant. At any given time, therefore, more than 8.25 million chickens will be concentrated in rural communities within an hour's drive of the plant.

3.     Industrial chicken houses are huge, and they smell terrible. Each building is approximately 600 feet (200 yards) long and over 40 feet wide. In other words, each building is longer than the height of the Washington Monument and almost twice as long as an NFL football field. Poultry growers build numerous industrial poultry buildings on single sites. The putrid smell associated with congregating hundreds of thousands of chickens in one place harms the health of neighboring communities, landowners, and local farmers. Noxious odors and pollution permeate the air, tractor-trailer trucks transporting birds to and from the slaughterhouse clog country roads, people suffer, and property values plummet.

4.     Industrial scale chicken operations also produce thousands of tons of chicken feces, bedding material, feathers, and other waste, along with thousands of dead and decomposing birds, each year. That waste is often spread across landscapes and streambanks, contaminating rivers and streams and threatening local drinking water sources. Remarkably, industrial chicken operations do not need operating permits in Tennessee, and the pollution that they cause is largely unregulated.

5.      Federal taxpayers frequently subsidize loans used to construct industrial chicken operations. The United States Department of Agriculture ("USDA"), through the Farm Service Agency ("FSA"), administers a federal lending program intended to help "family farms" with start-up and operational costs. Through that lending program, the FSA illegally guarantees seven figure loans used to construct large industrial chicken operations affiliated with Tyson. Tyson is a multi-billion-dollar, international conglomerate that does not need help from federal taxpayers.

6.      The FSA loan guarantees are illegal corporate welfare that contravene federal lending rules. The federal loan guarantees are illegal because the lending program is reserved for helping "family farms." Because Tyson controls virtually all aspects of the industrial chicken growing operations, those facilities are not "family farms" under applicable FSA lending rules.

7.      Each time that the FSA guarantees a loan used to construct an industrial chicken operation, federal law requires that the agency undertake a thorough analysis of the environmental impacts of, and alternatives to, the federal action. The FSA fails to do so. The FSA's environmental analysis is inadequate and perfunctory, and it fails to consider the cumulative environmental impacts of industrial scale poultry production.

## NATURE OF THE ACTION

8.      Plaintiff Concerned Citizens of West Tennessee ("Concerned Citizens") challenges Defendants' environmental review and authorization of loan guarantee assistance to Nguyen, LLC and Trang Nguyen LLC (jointly, "the Nguyens"), owners of two industrial scale poultry operations in Henderson County, Tennessee ("the Nguyen poultry facilities"). The Nguyens raise Tyson chickens for slaughter at Tyson's Humboldt, Tennessee slaughterhouse.

9.      Each Nguyen poultry facility encompasses eight industrial poultry houses. Each house is large enough to accommodate 39,000 birds, meaning that the Nguyen facilities can house

a total of 624,000 Tyson chickens at any given time. The facilities are anticipated to grow five flocks of Tyson chickens annually, meaning that more than 3.1 million Tyson chickens will be housed at the Nguyen facilities each year.

10.     Plaintiff brings this litigation against the USDA, the FSA, the Nguyens, and Farm Credit Mid-America, FLCA ("FCMA" or "lender") (jointly, "Defendants").

11.     FSA approved and issued guarantees for loans totaling approximately $3,552,000, the proceeds of which have been or will be used for the purchase, construction, and operation of industrial scale poultry facilities. Those facilities are affiliated with and controlled by Tyson.

12.     Farm Credit Mid-America, FLCA is the lender for the loans guaranteed by FSA. The Nguyens are the borrowers. The borrowers are required to abide by terms that the FSA imposed in the context of the loan guarantees.

13.     Because the Nguyen facilities are not "family farms" as defined by FSA regulations, FSA's approval of the loan guarantees requested by the Nguyens contravenes limitations imposed on the farm loan program by the Consolidated Farm and Rural Development Act ("Con Act"), 7 U.S.C. § 1921 *et seq.* FSA's approval of the loan guarantees to the Nguyens also violates limitations on the maximum loan size that can be guaranteed, and limitations on lending to applicants who can obtain access to credit absent FSA loan guarantees.

14.     Additionally, the FSA's rubber-stamp approval of the loan guarantees, without taking the requisite hard look at environmental impacts, violates the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4375.

15.     This Court should declare that the Nguyen facilities are not "family farms" eligible for the federal farm loan program because Tyson controls the design, construction, and operation of those facilities. In addition, this Court should revoke the illegal loan guarantees, enjoin FSA's

guarantee assistance to the Nguyens, enjoin the FSA from illegally guaranteeing other loans to industrial scale poultry facilities controlled by Tyson, invalidate FSA's perfunctory Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") under NEPA, and require environmental review and environmental mitigation measures in compliance with relevant laws.

## JURISDICTION AND VENUE

16.     This action is brought under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). FSA's authorization of loan guarantee assistance to the Nguyens, without complying with NEPA, 42 U.S.C. § 4321 *et seq.*, and in violation of the Con Act, 7 U.S.C. § 1921 *et seq.*, is a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

17.     This Court is authorized to issue a declaratory judgment and further relief pursuant to the APA, 5 U.S.C. § 706; Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and All Writs Act, 28 U.S.C. § 1651. An actual controversy within the meaning of the Declaratory Judgment Act exists between the parties.

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

19.     Venue lies in the United States District Court for the Western District of Tennessee, pursuant to 28 U.S.C. § 1391(e)(1), because "a substantial part of the events or omissions giving rise to the claim occurred" in Henderson County, Tennessee. Plaintiff Concerned Citizens of Western Tennessee is also headquartered within this District, and all members of Plaintiff Concerned Citizens reside within this District.

## PARTIES

20.     Plaintiff Concerned Citizens is a non-profit corporation organized under Tennessee law. Concerned Citizens formed in 2022 in direct response to the planned construction and operation of industrial scale chicken growing facilities in the Cedar Grove community in Henderson County, Tennessee. The mission of Concerned Citizens is to protect the natural environment and rural way-of-life in Henderson County and West Tennessee from the impacts of industrial scale chicken operations, and to advocate for the health and well-being of West Tennessee residents and prevent the degradation of the air and water in West Tennessee by industrial scale chicken production.

21.     Members and supporters of Concerned Citizens reside in, own businesses or property in, attend church services in, and/or regularly visit the Cedar Grove area where the Nguyen facilities are located. Many members and supporters are part of Cedar Grove's long-standing Black farming community.

22.     Some members and supporters of Concerned Citizens receive their drinking water from ground water wells, while others receive drinking water supplied by public utilities that draw water from area lakes, fed by area streams. Members and supporters of the group fish, swim, and recreate in area lakes and are concerned about the impact that thousands of tons of chicken litter will have on the watersheds of West Tennessee as well as the safety of the fish that they eat and the water that they drink.

23.     Members and supporters of Concerned Citizens will be directly impacted by the congregating of hundreds of thousands of chickens in their communities, and their ability to lead healthy and peaceful lives will suffer direct harm. Industrial chicken operations create noxious

odors and air pollution and clog country roads with huge trucks hauling thousands of chickens, tons of chicken feed, and tons of chicken litter.

24.     Members and supporters of Concerned Citizens fear that their friends, family, and fellow community members with asthma and similar health conditions will suffer breathing problems as a result of the noxious fumes, feathers, dust and particulate matter associated with industrial scale poultry operations in their communities.

25.     Industrial chicken operations harm the interests of members and supporters of Concerned Citizens by impairing their ability to enjoy the peace and quiet that should come with rural living. All West Tennesseans should be able to enjoy sitting on their porches, working in their gardens, and walking along their country roads without having those activities ruined by industrial poultry facilities.

26.     Members and supporters of Concerned Citizens are suffering harm to the value of their homes, farms, businesses and land holdings resulting from unmitigated industrial poultry operations in their communities.

27.     FSA's inadequate environmental review of the Nguyen facilities, and FSA's ultimate authorization of federal loan guarantee assistance for those facilities, causes direct injury to the health, economic, recreational, aesthetic, and conservation interests of Concerned Citizens. The FSA authorized federal assistance to an activity that threatens to degrade water quality, impair fish and wildlife habitat, emit noxious odors, toxic air pollution, and disturbing noise, all of which will directly and detrimentally affect Concerned Citizens. Those injuries are fairly traceable to FSA's flawed EA and FONSI and concomitant decisions to guarantee loans to the subject industrial scale chicken houses, and those injuries are redressable through this action to invalidate the EA, FONSI, and loan guarantee authorization; to require environmental review and

consultation in compliance with relevant laws; and/or to require that any further loan guarantee assistance be contingent upon the Nguyen facilities adopting mitigation measures designed to remedy harms to Concerned Citizens.

28.     Defendant USDA is a federal agency with its principal offices located at 1400 Independence Avenue, S.W., Washington, D.C. 20250.

29.     Defendant FSA is an agency within the USDA. The FSA's principal offices are located at 1400 Independence Ave., S.W., Washington, DC, 20250-0506. The FSA also maintains a Tennessee State Office in Nashville, Tennessee, as well as a Henderson/Decatur County Office in Lexington, Tennessee. The FSA approved, has a continuing obligation for, and manages the loan guarantee assistance at issue in this litigation.

30.     Defendant Tom Vilsack, the Secretary of Agriculture, has oversight authority for all actions taken by FSA. Secretary Vilsack is sued in his official capacity. His address is 1400 Independence Ave., S.W., Washington, D.C. 20250-0506.

31.     Defendant Zach Ducheneaux is Administrator of the FSA which is responsible for authorizing the loan guarantees at issue in this litigation. Administrator Ducheneaux is sued in his official capacity. His address is 1400 Independence Ave., S.W., Washington, D.C. 20250-0506.

32.     Defendant John Litz is the State Executive Director for the FSA State Office in Tennessee, which must approve final loan guarantee decisions made by county FSA offices. Director Litz is sued in his official capacity. His address is 801 Broadway, Nashville, TN 37203-3878.

33.     Defendant Andy Lewis is the County Executive Director for the Henderson/Decatur County FSA Office, which was responsible for performing the environmental

review prior to loan guarantee approval in this case. Director Lewis is being sued in his official capacity. His address is 80 South Broad St., Lexington, TN 38351-2074.

34.     Defendant Jon Travis is a Farm Loan Officer the Henderson/Decatur County FSA Office. He was responsible for overseeing the environmental review of the industrial poultry facilities at issue in this case.  Mr. Travis is being sued in his official capacity.  His address is 80 South Broad St., Lexington, TN 38351-2074.

35.     Defendant Nguyen, LLC is a Limited Liability Company formed in Tennessee in 2019, with the mailing address 825 Easton Dr., Abbeville, LA 70510. Nguyen, LLC consists of one member. The registered agent for Nguyen, LLC is Dan Van Nguyen. The address for the registered agent is 355 Judge McClough Rd., Cedar Grove, TN, 38321-3849, which is also the address for one of the Nguyen facilities.

36.     Dan Van Nguyen is one of the two borrowers on the FSA guaranteed farm loans for the Nguyen facilities.

37.     Defendant Trang Nguyen LLC is a Limited Liability Company formed in Tennessee in 2020, with the mailing address 1711 White Cemetery Rd., Cedar Grove, TN 38321-3863. Trang Nguyen LLC consists of one member. The registered agent for Trang Nguyen LLC is Trang Thi Nguyen. The registered agent's address is identical to the company's address and is also the address of one of the Nguyen facilities.

38.     Trang Thi Nguyen is one of the two borrowers on the FSA guaranteed farm loans for the Nguyen facilities.

39.     Defendant Farm Credit Mid-America, FLCA, a Federal Land Credit Association, is a subsidiary of Farm Credit Mid-America, ACA, an Agricultural Credit Association, which was

chartered in 1989. Farm Credit Mid-America, ACA's address is 12501 Lakefront Place, Louisville, KY 40299-4894.

40.    Farm Credit Mid-America, FLCA is the lender financial institution for the federally guaranteed farm loans for the Nguyen facilities.

41.    Farm Credit Mid-America, FLCA enjoys preferred lender program status within the FSA farm loan system.

## LEGAL FRAMEWORK

### I.    *Farm Loan Requirements*

42.    The Consolidated Farm and Rural Development Act ("Con Act"), 7 U.S.C. § 1921 *et seq*., is the authorizing statute for most USDA farm and rural development lending and grant programs. The Con Act authorizes the Secretary of the USDA "to make such rules and regulations… and make such delegations of authority as he deems necessary to carry out [the Act]." *Id*. at § 1989(a). The Secretary of the USDA has delegated the administration of many farm and rural development lending and grant programs to the FSA.

43.    The lending programs administered by the FSA are intended to help farmers buy or expand working farms. They are not intended to provide government subsidies to multi-billion-dollar conglomerates that destroy the character of rural communities while polluting their air and watersheds.

44.    FSA provides assistance to farmers and ranchers seeking to purchase a farm or expand or improve existing farms through the Farm Ownership Loan program. Farm Ownership Loan program assistance can take the form of direct loans from FSA (up to a maximum of $600,000), or through FSA's guarantee of loans through a commercial lender (up to a maximum of $2,037,000, as of December 2022). 7 C.F.R. § 761.8(a)(1).

45.     Under the farm loan program, FSA "may make and insure loans under this subchapter to farmers and ranchers in the United States." 7 U.S.C.A. § 1922(a)(1). In order to be eligible for those loans, "applicants who are individuals" must "be citizens of the United States" and "be or will become owner-operators of not larger than family farms." *Id*. Additionally, they must "be unable to obtain sufficient credit elsewhere to finance their actual needs at reasonable rates and terms, taking into consideration prevailing private and cooperative rates and terms in the community in or near which the applicant resides for loans for similar purposes and periods of time." *Id*.

46.     FSA regulations specify that only those operations in which the farmer and the farmer's family members actually control the operations qualify as "family farms" for the purposes of qualifying for an FSA loan guarantee. Specifically, FSA regulations implementing the Con Act define a "family farm" as an agricultural operation in which "[t]he majority of day-to-day, operational decisions, and all strategic management decisions are made" and "[a] substantial amount of labor to operate the farm is provided by… [t]he borrower, with input and assistance allowed from persons who are either related to the borrower by blood or marriage, or are a relative, for an individual borrower." 7 C.F.R. § 761.2.

47.     FSA guidance instructs agency officials to, in determining whether an operation is a "family farm," consider whether the operation is "[r]ecognized in the community as a farm," and states that "[a]ll of the day-to-day management and operational decisions should be made by members of the farm family," though "[t]he use of consultants, advisors, and similar experts is certainly acceptable provided someone in the farm family is the decision maker." FSA, *Guaranteed Loan Making and Servicing*, 2-FLP (Rev. 1), Part 8 (Loan Evaluation) Section 1 (Applicant Eligibility) Page 8-10, a true and correct copy of which is attached hereto as <u>Exhibit A</u>.

48.     Prior to securing FSA approval of a guarantee, "[t]he lender must meet all of the conditions specified in the conditional commitment." 7 C.F.R. § 762.130(c).

## II.     NEPA Review Requirements

49.     NEPA directs federal agencies "to use all practicable means, consistent with other essential considerations of national policy" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," to "preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice." 42 U.S.C. § 4331(b). "NEPA's purpose is to ensure a fully informed and well considered decision, and disclosure to the public that the agency has considered environmental concerns in its decision making." *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973–74 (8th Cir. 2011) (internal citations omitted), *cert. denied*, 556 U.S. 963 (2012).

50.     Pursuant to NEPA, FSA is required to prepare an Environmental Impact Statement ("EIS") before approving "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). FSA may prepare an EA to first determine whether a proposed activity is a major federal action significantly affecting the quality of the human environment that would necessitate an EIS. *See* 7 C.F.R. § 799.40(a).

51.     FSA must "[u]se all practical means to protect and, where possible, improve the quality of the human environment and avoid or minimize any adverse environmental effects of FSA actions," and "[e]nsure that the requirements of NEPA and other State and national environmental policies designed to protect and manage impacts on the human environment are addressed… at the earliest feasible stage in the planning of any FSA action… [d]uring all stages of the decision making process… [u]sing professional and scientific integrity in their discussions

and analyses, identifying applicable methodologies, and explaining the use of the best available information." 7 C.F.R. § 799.2.

52.    FSA must additionally "[e]nsure protection of basic resources, including important farmlands and forestlands, prime rangelands, wetlands, floodplains, and other protected resources," and "it is FSA policy not to approve or fund proposed actions that, as a result of their identifiable impacts, direct, indirect, or cumulative, would lead to or accommodate either the conversion of these land uses or encroachment upon them." *Id*.

53.    FSA regulations list certain proposed FSA actions as presumptively requiring the preparation of an EA, including the "[c]onstruction or major expansion of a large CAFO, as defined by the U.S. Environmental Protection Agency in 40 CFR 122.23, regardless of the type of manure handling system or water system." 7 C.F.R. § 799.41(a)(9).

54.    A "large CAFO" is "a lot or facility [] where… [a]nimals [] have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period," "[c]rops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility," and a certain number of animals are stabled or confined. 40 C.F.R. § 122.23. Broiler chicken facilities that do not use a liquid manure handling system must confine at least 125,000 chickens to qualify as "large CAFOs." *Id*.

55.    The environmental review requirements set out in the FSA regulations must be met for guaranteed Farm Ownership Loans. 7 C.F.R. § 762.128(a). FSA must determine "whether an environmental problem exists," relying on sources such as "information supplied with the application," "[t]he Agency Official's personal knowledge of the operation," and "[e]nvironmental resources available to the Agency including, but not limited to, documents, third parties, and governmental agencies." *Id*. § 762.128(b). Lenders "will assist in the environmental review

process by providing environmental information" and "must retain documentation of their investigation in their applicant's case file." *Id*. § 762.128(c).

A. <u>Contents of an Environmental Assessment</u>

56.     "FSA prepares an EA to determine whether a proposed action would significantly affect the environment, and to consider the potential impacts of reasonable alternatives and the potential mitigation measures to the alternatives and proposed action." 7 C.F.R. § 799.40(a). After completing an EA, FSA must either make a Finding of No Significant Impact or determine that an EIS must be prepared. *Id*. at § 799.40(c).

57.     An EA must include "[a] discussion of the purpose of and need for the proposed action," "[a] discussion of alternatives, if the proposed action involves unresolved conflicts concerning the uses of available resources," "[a] discussion of the existing pre-project environment and the potential environmental impacts of the proposed action, with reference to the significance of the impact as specified in § 799.8 and 40 CFR 1508.27," and the "[l]ikelihood of any significant impact and potential mitigation measures that FSA will require, if needed, to support a FONSI." 7 C.F.R. § 799.42(a). *See also* 42 U.S.C. § 4332 (agency must include in environmental review information on "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action," and should "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.").

58.     In environmental review documents, FSA must consider "direct and indirect environmental consequences, including any cumulative impacts, of the proposed action and of the alternatives." 7 C.F.R. § 799.53(b) (discussing EIS requirements). These requirements apply to

14

preparation of EAs. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 858–59 (S.D. Ohio 2020) ("Just as is required for an EIS, 'the EA must take a "hard look" at the environmental consequences of the proposed action ... including its direct, indirect, and cumulative effects.'" (quoting *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 53 (D.D.C. 2019))).

59.     FSA guidance states that cumulative impacts analysis requires an evaluation of "all Federal, State, local, and private activities that are currently taking place, have occurred in the past, or may reasonably be assumed to take place in the future in the cumulative effects area," and notes that, for example, "aggregations of farms, such as aggregations of large CAFOs within a limited geographic proximity, may trigger the need for an analysis of the potential cumulative [greenhouse gas] emissions." FSA, *Environmental Quality Programs*, 1-EQ (Rev. 3), Part 1 (General Information) Section 9 (Special Compliance and Processing Provisions) and Section 25 (Extraordinary Circumstances, Controversy and Cumulative Effects) Page 2-9, a true and correct copy of which is attached hereto as <u>Exhibit B</u>.

60.     To determine "whether a proposed action will have a significant effect on the quality of the human environment, FSA will consider the proposed action's potential effects in the context of society as a whole, the affected region and interests, the locality, and the intensity of the potential impact as specified in 40 CFR 1508.27." 7 C.F.R. § 799.8.

61.     If FSA determines in completing the EA that a proposed action is expected to have significant effects, it must prepare an EIS. 7 C.F.R. § 799.50. "If after completing the EA, FSA determines that the proposed action will not have a significant effect on the quality of the human environment, FSA will issue a [Finding of No Significant Impact ('FONSI')]." 7 C.F.R. § 799.45. The FONSI must include FSA's reasons for determining "that the proposed action will have no significant environmental impacts." *Id*.

62.     Subject to certain limited exceptions, "FSA or a program participant must not take any action, implement any component of a proposed action, or make any final decision during FSA's NEPA and environmental compliance review process that could have an adverse environmental impact or limit the range of alternatives until FSA completes its environmental review" by, for example, issuing a FONSI after preparing an EA. 7 C.F.R. § 799.11.

63.     In other words, an agency may not "limit its choice of reasonable alternatives by 'committing resources' to a specific alternative before completing the NEPA analysis and thus prejudicing the remaining analysis and final selection, turning the NEPA process into a mere justification of an already made decision." *City of Crossgate v. U.S. Dep't of Veterans Affs.*, 526 F. Supp. 3d 239, 256 (W.D. Ky. 2021) (citations omitted). An agency may not "predetermine" the outcome of environmental review, "otherwise the analysis is just a 'foreordained formality.'" *Id.* (citations omitted).

B.  Mitigation Measures

64.     If the finding of no significant impact "is conditioned upon the implementation of measures (mitigation actions) to ensure that impacts will be held to a nonsignificant level, the FONSI must include an enforceable commitment to implement such measures on the part of FSA, and any applicant or other party responsible for implementing the measures will be responsible for the commitments outlined in the FONSI." 7 C.F.R. § 799.45(c).

65.     FSA guidance notes that this commitment by FSA can take the form of "enforceable approval conditions." Exhibit B at Page 1-34. "[T]he mitigation actions, terms, and timeline must be stipulated in FSA-850 and FONSI, and included in all loan agreements and conditional commitments." *Id.* at Page 1-35.

66.     FSA guidance describes common mitigation measures, such as "avoiding the impact by not taking a certain action or parts of an action," "limiting the magnitude of the action, timing, or geographic extent of an action and its implementation," "rectifying the impact by repairing, rehabilitating, or restoring the affected environment," "reducing or eliminating the impact over time by implementing various preservation and maintenance operations during the life of the action," "compensating for the impact by replacing or providing substitute resources or environments," and "formulating site-specific management and operating plans to minimize or avoid impacts." *Id*. at Pages 1-35 to 1-36.

67.     FSA regulations also require lenders under the farm loan programs to supervise the borrower, and their duties include "[e]nsuring loan funds are not used for unauthorized purposes… [e]nsuring borrower compliance with the covenants and provisions contained in the promissory note, loan agreement, mortgage, security instruments, any other agreements, and this part," and "[e]nsuring the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm." 7 C.F.R. § 762.140. The supervision would thus include oversight of borrower compliance with any mitigation measures included in the loan agreements.

68.     Potential FSA program applicants, such as borrowers for guaranteed loans, are required by regulation to "[w]ork with other appropriate Federal, State, and Tribal governments to ensure all environmental factors are identified and impacts addressed and, to the extent possible, mitigated, consistent with how mitigation is defined in 40 CFR 1508.20." 7 C.F.R. § 799.7.

C.  Public Notice and Opportunity to Comment

69.     The Supreme Court has recognized that NEPA requires agencies to involve the public in their environmental review process, and that this requirement serves two purposes: first, to "ensure[] that the agency, in reaching its decision, will have available, and will carefully

consider, detailed information concerning significant environmental impacts," and second, to "guarantee[] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

70.     FSA is required to undertake environmental review under NEPA "[i]n consultation with all interested parties, including Federal, State, and Tribal governments," and must, "[a]s appropriate, make environmental review available to the public through various means, which can include, but are not limited to: Posting on the National FSA Web site or a State FSA Web site, publishing in the Federal Register, or publishing in a newspaper in the area of interest." 7 C.F.R. § 799.2. FSA regulations define "consultation" as "the process of soliciting, discussing, and considering the views of other participants in the environmental review process and working toward agreement where feasible." 7 C.F.R. § 799.4.

71.     FSA regulations require FSA to "involve the public in the environmental review process as early as possible and in a manner consistent with 40 CFR 1506.6." 7 C.F.R. § 799.15. To determine what level of public participation is appropriate, FSA must consider "[t]he scale of the proposed action and its probable effects," "[t]he likely level of public interest and controversy; and [] [a]dvice received from knowledgeable parties and experts." *Id*.

72.     "Depending upon the scale of the proposed action, FSA will… [c]oordinate public notices and consultation with [agencies]," and "[m]ake appropriate environmental documents available to interested parties by request." *Id*. In addition, "[i]f the effects of a proposed action are local in nature and the scale of the proposed action is likely to generate interest and controversy at the local level," FSA must "[n]otify appropriate State, local, regional, and Tribal governments and clearinghouses, and parties and organizations… known to have environmental, cultural, and

18

economic interests in the locality affected by the proposed action" and "[p]ublish notice of the proposed action in the local media." *Id*.

73.     FSA must also determine whether to hold a public meeting by considering, among other factors, whether "[t]here is substantial controversy concerning the environmental impact of the proposed action" or "substantial interest in holding a public meeting." 7 C.F.R. § 799.17.

## FACTUAL BACKGROUND

### I.     *Tyson's Control of Poultry Operations in West Tennessee*

74.     Tyson is a multibillion-dollar food and meat processing company publicly traded on the New York Stock Exchange under the ticker symbol TSN. For its fiscal year 2021, Tyson reported total sales exceeding $47 billion, gross profit exceeding $6.5 billion, and net income exceeding $3 billion. As of October 2, 2021, Tyson had approximately 137,000 employees.

75.     In fiscal year 2021, Tyson sold products in approximately 140 countries. In addition to the United States, Tyson's major sales markets include Australia, Canada, Central America, Chile, China, the European Union, the United Kingdom, Japan, Mexico, Malaysia, the Middle East, South Korea, Taiwan, and Thailand.

76.     Tyson's chicken production operations are fully vertically integrated, meaning that Tyson owns virtually all means of production including broiler hatcheries, chicks, chicken feed, feed mills, blending mills, grain elevators, and chicken processing facilities where chickens are slaughtered.

77.     Large chicken processing companies like Tyson use consolidated market power and the power of contract to control growers, who raise the chickens that are later slaughtered and sold at market.  In 2018 the Office of Inspector General ("OIG") for the U.S. Small Business Administration ("SBA") conducted a review of SBA loans to poultry growers, and the Inspector

General found that large chicken processing companies (integrators) exercise such comprehensive control over poultry growers that those growers do not qualify for small business loans. Poultry growers are so tightly affiliated with, and controlled by, large poultry integrators that those growers are not considered "small businesses" under the SBA's regulatory and statutory framework. Because poultry growers are appendages of large integrators, the OIG concluded that poultry growers do not qualify for federally backed small business loans through the SBA. SBA OIG, *Evaluation of SBA 7(a) Loans to Poultry Farmers*, Report 18-13 (Mar. 6, 2018), a true and correct copy of which is attached hereto as Exhibit C, and is also available at https://www.sba.gov/sites/default/files/2019-07/SBA-OIG-Report-18-13.pdf.

78.     Tyson recently spent approximately $425 million constructing a chicken slaughtering facility in Humboldt, Tennessee. According to Tyson, that facility will slaughter more than 1.2 million chickens each week. Tyson estimates that, in order to provide an adequate supply of chickens to that facility, it needs approximately 330 industrial chicken houses, each housing more than 25,000 birds, to be constructed within a 60-mile radius of the plant.

79.     Tyson also expanded its Union City, Tennessee, slaughtering facility in late 2020—its second expansion in the last five years. The Union City facility is located about 50 miles from the Humboldt facility, in Obion County. The expansion of the Union City facility requires the addition of another 230 industrial chicken houses.

80.     When the FSA approved and issued the "family farm" loan guarantees challenged in this litigation, it was aware of Tyson's plans for hundreds of industrial poultry houses to be built across West Tennessee. Those plans were reported in the *Jackson Sun* in 2020. Adam Friedman, *The impact of chicken houses and new facilities as Tyson Foods expands across West Tennessee*, Jackson Sun (Dec. 10, 2020), a true and correct copy of which is attached hereto as Exhibit D, and

is also available at https://www.jacksonsun.com/story/news/2020/12/10/tyson-foods-looks-take-over-west-tennessee/3859092001/.

81.     As observed by the United States District Court for the Western District of Kentucky, Tyson occupies a position of power and responsibility with respect to all aspects of how Tyson's chickens are raised at industrial scale chicken houses. *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F.Supp.2d 693, 720 (2003). Tyson tightly controls the operation of those industrial scale facilities, and it makes all major decisions. Tyson owns the chickens throughout the production process, including when the chickens occupy the industrial chicken houses. *Id.* In fact, Tyson provides not only the chicks, but the feed, technical support, medicine, and veterinary care for the chicks. *Id.* Tyson is involved with facility design and equipment specifications. *Id.* Tyson directs its growers as to how to build and orient the chicken houses; how to heat, cool and ventilate the buildings; and how to illuminate the houses to ensure optimum chicken growth. *Id.* Tyson instructs poultry growers to discharge ammonia from inside the poultry houses out into the environment. *Id.* Tyson provides exacting equipment specifications and advises growers as to the proper retailers from which to purchase equipment. *Id.* If a grower chooses to deviate from Tyson's specifications or growing instructions, Tyson reserves the right to refuse to deliver flocks of chicks to the grower. *Id.*

## II.     *Industrial Poultry Operations Harm Communities and the Environment*

82.     The environmental harms caused by industrial animal agriculture have been clearly established for decades. A USDA's Economic Research Service ("ERS") report summarizes: "While environmental policies may not explicitly recognize the compound (air and water) effects of manure management practices, these interactions are well known to soil and animal scientists." Marcel Aillery et al., *Managing Manure To Improve Air and Water Quality*, ERR-9 (Sept. 2005),

Page 9, a true and correct copy of which is attached hereto as <u>Exhibit E</u>, and is also available at https://www.ers.usda.gov/publications/pub-details/?pubid=46351.

83.     Industrial animal agriculture, including industrial poultry operations, creates enormous amounts of animal waste. "Pollution from animal waste includes runoff of nutrients, organic matter, and pathogens to surface water, leaching of nitrogen and pathogens to ground water, volatilization of gases and odors to the atmosphere, and emissions of fine particulates." <u>Exhibit E</u> at Page 3.

84.     Because animal wastes such as chicken "litter" (a mixture of feces, urine, feathers, and bedding material) contain nitrogen and phosphorus, they can be used as fertilizer for crops when properly applied. However, as another USDA report noted, many farmers prefer to use commercial fertilizers compared to animal waste, "because they are less bulky, easier to apply, and have a more certain nutrient content." Marc Ribaudo et al., *Manure Management for Water Quality: Costs to Animal Feeding Operations of Applying Manure Nutrients to Land*, AER-824 (June 2003), Page 6, a true and correct copy of which is attached hereto as <u>Exhibit F</u>, and is also available at https://www.ers.usda.gov/publications/pub-details/?pubid=41587.

85.     USDA publications have also observed that, because not all farms are willing to use animal waste, "[w]hen animals are concentrated geographically, operators may have difficulty finding enough land off the producing farm to fully assimilate the nutrients in the manure." *Id*. at Page 8. When "the density of animals in a watershed increases, the impact on surface-water quality grows," primarily because of "increased production of manure nutrients, and inadequate crediting of nutrients in manure when farmers calculate their nutrient applications to cropland." *Id*.

86.     USDA reports have noted that "[i]f there are many livestock in a region relative to cropland acreage, the risk of nutrient pollution from manure may be high," and when the manure

is overapplied and the nutrients aren't taken up by plants, those nutrients "can run off into surface water where, in sufficient concentration, they can harm plant and marine life." U.S. Dep't of Agric., Agricultural Resources and Environmental Indicators, 2019 EIB-208 74, 92 (Daniel Hellerstein et al. eds., 2019), a true and correct copy of which is attached hereto as Exhibit G, and is also available at https://www.ers.usda.gov/publications/pub-details/?pubid=93025.

87.     According to USDA documents, in 2012 much of western Tennessee is at risk for nutrient pollution because of the high ratio of nutrients from manure and other fertilizers compared to crop/pasture uptake. Exhibit G at Pages 92–93.

88.     USDA reports describe how industrial animal operations release nitrogen into the environment, in forms such as ammonia and nitrate. Ammonia in the form of nitrate "can degrade water quality by spurring eutrophication," and it "can be a human or animal health hazard in drinking water if in high enough concentrations. The U.S. EPA has established a maximum contaminant level for drinking water of 10 ppm for nitrate-nitrogen." Exhibit E at Page 6. Nitrate enters streams, lakes, and ground water "through runoff or leaching from fields receiving manure, or from leaks in manure storage structures." Id.

89.     Excess nitrogen and phosphorus in the surface waters accelerate algae production and "result[s] in a variety of problems including clogged pipelines, fish kills, and reduced recreational opportunities." Exhibit F at Page 7.  USDA publications have also recognized that, "[b]esides harming aquatic ecosystems, nitrogen in water is also a potential human health threat, particularly to infants." Id.

90.     Industrial poultry operations can cause harmful bacteria to enter surface and ground water because animal waste also "harbors a wide variety of microorganisms that can be pathogenic to humans and animals." Exhibit G at Page 74.

91.     USDA reports state that industrial livestock and poultry operations and the animal waste generated from them "can also affect local air quality (haze, small particle concentrations, odor) and greenhouse gas emissions." *Id*.

92.     As an air pollutant, "[a]mmonia is a pungent gas that is a potential health hazard to humans and livestock," and it can rapidly convert to ammonium aerosol once in the atmosphere, where it "contributes directly to fine particulates, the source of haze in the atmosphere." Exhibit E at Page 6. Ammonia from animal operations makes up "50 to 70 percent of annual ammonia emissions from all sources in the United States." *Id*.

93.     In addition to other air pollutants like ammonia, industrial poultry facilities also emit noxious odors. A research project sponsored by the USDA National Agroforestry Center states that "[o]dors generated in animal facilities . . . that are intense and detectable at appreciable distances all travel as aerosols." John Tyndall and Joe Colletti, *Air Quality and Shelterbelts: Odor Mitigation and Livestock Production A Literature Review* (March 2000), Page 23, a true and correct copy of which is attached hereto as Exhibit H, and is also available at https://www.fs.usda.gov/nac/assets/documents/research/publications/finalreport.pdf.

94.     The report notes that "[t]here are serious social ramifications involved with the issue of livestock odor and odor management," and that "[m]uch research supports the concern that livestock generated dust and gas concentrations can affect human and animal mental and physical health." *Id*. at Page 13. Additionally, "[r]esearch points to decreased real estate values… and negative effects on recreation and tourism," and "neighbors and communities are being strained by the livestock odor issue." *Id*. (citations omitted).

95.     An Environmental Protection Agency ("EPA") literature review on livestock and poultry manure pollution states that animal agriculture and related waste management "account

24

for 18% of all human-caused greenhouse gas emissions." U.S. ENVTL. PROT. AGENCY, *Literature Review of Contaminants in Livestock and Poultry Manure and Implications for Water Quality*, EPA 820-R-13-002 (July 2013), Page 3, a true and correct copy of which is attached hereto as Exhibit I, and is also available at

https://nepis.epa.gov/Exe/ZyPDF.cgi/P100H2NI.PDF?Dockey=P100H2NI.PDF.

96.     EPA states that "air quality degradation, particularly from concentrated livestock and poultry operations, has been documented, related to releases of toxic as well as odorous substances, particulates, and bioaerosols containing microorganisms and human pathogens." *Id*. This air pollution "has been related to human health concerns for workers in confined operations and also for neighbors to large facilities." *Id*.

97.     Despite all the known harms of industrial animal agriculture, they are largely unregulated by the state of Tennessee. As reported in the *Tennessee Lookout*, in 2017 the Tennessee legislature changed the law so that operators of industrial poultry facilities no longer needed to obtain water quality permits from the state.[1] Anita Wadhwani, *Tyson Foods' Expansion in West Tennessee is Pitting Longtime Farmers against One of the Nation's Biggest Protein Suppliers*, Tennessee Lookout (May 3, 2021), a true and correct copy of which is attached hereto as Exhibit J, and is also available at https://tennesseelookout.com/2021/05/03/tyson-foods-expansion-in-west-tennessee-is-pitting-longtime-farmers-against-one-of-the-nations-biggest-protein-suppliers/.

---

[1] Tyson announced that it would be locating a new slaughtering facility in Humboldt, Tennessee in 2017. That same year, it announced the large expansion of an existing slaughtering facility in Union City, Tennessee. A local newspaper reported that an estimated 560 new chicken houses would be needed to supply the facilities. *See* Exhibit D.

98.     The state currently only requires operating permits for industrial animal facilities that are "large CAFOs" under the EPA regulations which either intend to directly discharge into surface waters or which use a liquid waste handling system. Because poultry operations almost entirely use dry waste systems, that legislative change effectively removed industrial chicken facilities from any state oversight beyond general requirements to control sediment stormwater runoff during construction.

99.     In 2021, the Tennessee legislature also passed legislation removing the power of local health boards to regulate industrial animal operations on health grounds. That change occurred just months after the Madison County Board of Health, in western Tennessee, met to discuss regulating Tyson Foods chicken houses on health hazard grounds. *Id*.

100.     The State of Tennessee currently requires no nutrient management plans, no plans to manage dead birds, and no monitoring obligations for industrial poultry operations.

### III.     *The Nguyens Purchase Land and Apply for Loans*

101.     On November 19, 2019, Dan Nguyen formed a limited liability company known as Nguyen, LLC. On May 15, 2020, Trang Nguyen formed a limited liability company known as Trang Nguyen LLC.

102.     On November 7, 2019, Dan Nguyen purchased approximately 128 acres of land located at Judge McClough Road 355 in Cedar Grove, Tennessee. Dan Nguyen transferred this property to Nguyen, LLC on February 20, 2020.

103.     On November 7, 2019, Trang Nguyen purchased approximately 152 acres of land located at Judge McClough Road in Cedar Grove, Tennessee. That property is across the road from the property purchased by Dan Nguyen. Trang Nguyen transferred this property to Nguyen, LLC

on February 11, 2020. Nguyen, LLC transferred this property to Trang Nguyen LLC on May 28, 2020.

104.    Dan and Trang Nguyen did not have the money required to build industrial scale chicken houses without taking out loans.

105.    Dan and Trang Nguyen applied for loans from Farm Credit Mid-America ("FCMA"). They applied for those loans for the purpose of constructing industrial scale chicken houses that would be used to grow Tyson chickens.

106.    With the assistance of FCMA as lender, Dan and Trang Nguyen applied for and received loan guarantees from the Farm Service Agency.

107.    Dan Nguyen applied for two loans from FCMA: one loan in the amount of $2,584,075; and one loan in the amount of $1,776,000.

108.    The FSA guaranteed ninety percent (90%) of the $1,776,000 loan to Dan Nguyen.

109.    Trang Nguyen applied for two loans from FCMA: one loan in the amount of $2,668,075; and one loan in the amount of $1,776,000.

110.    The FSA guaranteed ninety percent (90%) of the $1,776,000 loan to Trang Nguyen.

111.    The final loan guarantees for the Nguyens state that the "Loan Guarantee and all action hereunder are governed by and must be in compliance with the statutory authority and regulation issued thereunder at 7 C.F.R. Part 762 in effect on the date of this instrument, and future amendments not inconsistent with this instrument."

112.    The FSA's commitments to issue the loan guarantees contained the following condition: "Conditional Commitment subject to executed poultry contract with Tyson."

113.    True and correct copies of Nguyen LLC FSA Loan Documents (March 3, 2022 Application for Guarantee; March 9, 2022 FSA Narrative Review; March 16, 2022 Guaranteed Loan Applicant Eligibility; March 16, 2022 Request for Obligation of Funds Guaranteed Loans; March 18, 2022 Conditional Commitment; April 4, 2022 Loan Closing Report and Lender Certification; May 13, 2022 Loan Guarantee) are attached as Exhibit K.

114.    True and correct copies of Trang Nguyen LLC FSA Loan Documents (March 3, 2022 Application for Guarantee; March 17, 2022 FSA Narrative Review; March 17, 2022 Guaranteed Loan Applicant Eligibility; March 17, 2022 Request for Obligation of Funds Guaranteed Loans; March 18, 2022 Conditional Commitment; April 4, 2022 Loan Closing Report and Lender Certification; August 4, 2022 Loan Guarantee) are attached as Exhibit L.

115.    Proceeds of the federally guaranteed loans to Dan and Trang Nguyen were used to construct a total of sixteen (16) industrial scale chicken houses, eight houses on the property owned by Nguyen, LLC and eight houses on property across the road owned by Trang Nguyen LLC.

*IV.*    ***FSA's Environmental Review for the Loan Applications***

116.    On October 20, 2021, a notice that a draft EA regarding the potential environmental impacts of the Nguyen facilities was published in the Lexington Progress, a local newspaper. That notice indicated that the draft EA was available for review upon request, and that public comments would be accepted for 30 days following publication of the notice.

117.    On October 28, 2021, the FSA provided a version of the draft EA to Jackie Washburn, a Henderson County resident. On November 9, Ms. Washburn wrote to FSA stating that the draft EA contained numerous and significant errors. The draft EA appeared to be partially copied and pasted from a document about a similar project sited in the Beech Bluff community in Madison County. For example, Ms. Washburn noted that Section 1.6 of the initial draft EA

referenced the project site being "surrounded by a railroad bed to the North," and Section 2.2.4 stated that the proposed action was located "13 miles East of Jackson in Beech Bluff, TN." Those statements are clearly wrong and have nothing to do with the industrial chicken facilities proposed for construction in the Cedar Grove community by the Nguyens.

118.    A true and correct copy of the October Draft EA that the FSA provided to Ms. Washburn on November 9, 2021 is attached as <u>Exhibit M</u>.

119.    Because the FSA included numerous errors in its draft EA, Ms. Washburn requested that FSA revise the EA, issue a new public notice, and extend the public comment period. As Ms. Washburn put it, "[t]he public cannot reasonably be expected to make comment on the project without accurate information to assist in the understanding of this issue."

120.    FSA responded by providing a revised draft of the EA to Ms. Washburn on November 19, the day the initial public comment period was set to end. The FSA did not issue a revised public notice, or provide notice that the comment period was extended. Thus, the FSA deprived the public of an opportunity to comment on an accurate draft EA.

121.    The FSA's revised draft EA contained several alterations:

   a)  it deleted, without explanation, a statement about FSA staff conducting a site visit to look for impacted wetlands;

   b)  it deleted a statement explaining that water would be provided to the industrial poultry facilities via private wells; and

   c)  it deleted a section describing the litter storage shed.

122.    A true and correct copy of the revised November Draft EA is attached as <u>Exhibit N</u> and made a part of this complaint.

123.    The FSA received one hundred fifty-four (154) comments from the public regarding the draft EA.

124.     On February 15, 2022, the FSA issued its final Environmental Assessment and Finding of No Significant Impact. Those documents failed to summarize or respond to comments received from the public.

125.     A true and correct copy of the final EA, FONSI, and appendices A, B and M is attached as Exhibit O. Correspondence between Ms. Washburn and FSA regarding the draft EAs is included in Appendix M of the final EA.

126.     The final EA's Appendix M contains email correspondence between FSA and community member Thomas Gorden regarding a 38-page comment on the draft EA, dated November 22, 2021. Although FSA indicated that these written comments "will be considered and appropriate changes incorporated into the EA," FSA failed to include the actual 38-page comment within Appendix M of the final EA. *See* Exhibit O-3.

127.     A true and correct copy of Mr. Gorden's November 22, 2021 comment to FSA regarding the draft EA is attached as Exhibit P.

128.     On March 18, 2022, FSA instructed the Nguyens to publish a notice in the Lexington Progress indicating that FSA had completed a final EA and made a determination that the Nguyen facilities would not have a significant impact on the environment. That notice was published in the Lexington Progress on March 30 and April 6, 2022.

## V.     *FSA's approval of the loan guarantees for the Nguyen facilities violated the Con Act.*

### A.   The Nguyen facilities are not "family farms."

129.     The Nguyens and FCMA asked the Farm Service Agency to provide loan guarantees under the Farm Ownership Program, a lending program intended to assist "family farms."

130.    USDA regulations specify that only those operations in which the farmer and the farmer's family members actually control the operations qualify as "family farms" for lending purposes. *See* 7 C.F.R. § 761.2.

131.    USDA regulations define a "family farm" as an agricultural operation in which "[t]he majority of day-to-day, operational decisions, and all strategic management decisions are made" and "[a] substantial amount of labor to operate the farm is provided by… [t]he borrower, with input and assistance allowed from persons who are either related to the borrower by blood or marriage, or are a relative, for an individual borrower." 7 C.F.R. § 761.2.

132.    Because Tyson controls everything, the Nguyens' industrial poultry facilities do not qualify as "family farms" under applicable lending rules.

133.    At the time that the Nguyens requested federal loan guarantee assistance, all defendants knew or should have known that the Nguyens' industrial poultry operations would not meet the regulatory definition of "family farms."

134.    Tyson selected the construction contractor that built the industrial poultry houses at the Nguyen poultry facilities.

135.    Tyson financed a large portion of the cost of building the Nguyen poultry facilities.

136.    In addition to money borrowed by the Nguyens from FCMA, Tyson contributed more than $960,000 to the construction of poultry houses on each of the two Nguyen sites for total contributions by Tyson of more than $1.9 million.

137.    A true and correct copy of the lender's Narrative for Third Party Review for Nguyen LLC is attached, designated as Exhibit Q.

138.    A true and correct copy of the lender's Narrative for Third Party Review for Trang Nguyen LLC is attached, designated as Exhibit R.

139.    FCMA characterized Tyson's contributions as "a loan owed by the grower to Tyson without repayment demands," that would "be forgiven over a 5 year period as long as the grower stays in the contract."

140.    All defendants knew or should have known that Tyson would be involved with facility design and equipment specifications.

141.    All defendants knew or should have known that Tyson would direct the Nguyens as to how to build and orient the chicken houses; how to heat, cool and ventilate the buildings; and how to illuminate the houses to ensure optimum chicken growth.

142.    All defendants knew or should have known that Tyson provides equipment specifications and advice to growers as to the proper retailers from which to purchase equipment.

143.    All defendants knew or should have known that, under Tyson's contracts with the Nguyens, Tyson reserves the right to refuse to deliver flocks of chicks to the Nguyens if they deviate from Tyson's requirements and specifications.

144.    All defendants knew or should have known that Tyson owns the chickens and the chicken feed throughout the production process, and Tyson provides technical support, medicine, and veterinary care for the chicks.

145.    All defendants knew or should have known that the Nguyens will not be poultry "farmers." They will be poultry caretakers who own neither chickens nor feed.  They will be much like indentured servants, strapped with tremendous debt and laboring within an industrial meat complex in which they are required to follow Tyson's rules, lest they suffer extreme financial consequences.

146.    Tyson's control over the Nguyen poultry facilities is reflected by Tyson's signage posted on the properties:




147.    In its final Environmental Assessment issued on February 15, 2022, FSA stated, without explanation, that "[t]he applicants have been determined to be a family farm as defined by 7 CFR 761.2." The same statement occurs in the October and November versions of the draft EA. Exhibit O at Page 7.

148.    Before the Nguyens submitted applications to the FSA for loan guarantee assistance, they inspected or reviewed Tyson's grower contract.

149.    Before FCMA helped the Nguyens submit applications to the FSA for loan guarantee assistance, FCMA inspected or reviewed Tyson's grower contract.

150.    Before the FSA issued loan guarantees for the Nguyen facilities, the FSA inspected or reviewed Tyson's grower contract.

B.  The FSA's combined loan guarantee for the Nguyen facilities exceeded the maximum permitted by Con Act regulations.

151.    FSA rules limit the size of loans that it guarantees under the Farm Ownership Loan program.  Specifically, at the time that the Nguyens applied for loan guarantee assistance, the FSA was not allowed to guarantee loans larger than $1.776 million. 7 C.F.R. § 761.8(a)(1).

152.     Accordingly, Dan and Trang Nguyen decided to divide their Tyson chicken growing operation into two operations, one owned by Nguyen, LLC and one owned by Trang Nguyen LLC, and they applied for separate loans and separate loan guarantees for each facility.

153.     The two Nguyen poultry facilities are located across the road from each other in Cedar Grove, Tennessee.

154.     Each of the two Nguyen facilities received an FSA loan guarantee of $1.776 million.

155.     The total of the two loan guarantees received by the Nguyen facilities is $3.552 million, well above the FSA's single loan guarantee limit of $1.776 million.

C.   The Nguyens were able to able to obtain outside credit.

156.     Dan Nguyen is described in FCMA's documentation as having a "strong credit score… with clean history," and as having made "good investments in the past that [have] paid off from a financial perspective." *See* Exhibit Q at Page 2.

157.     The family farm loan assistance program is reserved for assisting "family-size" farms that are unable to obtain credit elsewhere. The Nguyen facilities do not meet the regulatory criteria for that lending program because they are much bigger than "family-size" farms and because they were able to obtain, and did obtain, credit elsewhere.

158.     The Con Act specifies that the USDA may only "make and ensure loans" when the loan applicants are "unable to obtain sufficient credit elsewhere to finance their actual needs at reasonable rates and terms, taking into consideration prevailing private and cooperative rates and terms in the community in or near which the applicant resides for loans for similar purposes and periods of time." 7 U.S.C.A. § 1922(a)(1).

159. FSA guidance states: "Congress established FSA's loan limits to assist family sized operations," and so it is "important that every effort be made to ensure that loans are made only when it is certain that other credit is not available." <u>Exhibit A</u> at Page 8-11. Although "[l]oan participation agreements are acceptable when FSA farm loans cannot meet the total needs, [] if maximum FSA farm loans are a small portion of the total credit requirements, this may be another indicator of a larger than family-size farm when considered with other factors, or that credit is available from another source." *Id*.

160. The Nguyens received funding from Tyson in order to construct their facilities. For each facility, Tyson contributed more than $960,000 in "loans" for which there were no repayment terms or interest charged for a total of more than $1.9 million.

161. The Nguyens also received loans from FCMA which were not guaranteed by FSA. In fact, for both facilities the amount of the non-guaranteed loan was larger than the amount of the guaranteed loan ($2,584,075 and $2,668,075 compared to $1,776,000).

162. The Nguyen facilities required loans totaling $5.3 million (for Dan Nguyen) and $5.4 million (for Trang Nguyen). The *maximum* FSA loans only account for *one third* the total funding required for the facilities, even when the facilities are artificially separated into two distinct projects. As the FSA guidance suggests, this indicates that either the "farms" are larger than family-size, or credit is available elsewhere, or both.

### VI. *The FSA performed a perfunctory environmental review in violation of NEPA.*

A. <u>FSA's environmental review did not address significant direct, indirect, and cumulative impacts.</u>

163. The FSA's environmental review failed to consider the significant environmental affects for the Nguyen facilities, and the final EA was perfunctory, incomplete and predetermined. The FSA's consideration of numerous environmental issues, including Wildlife and Habitat,

Cultural Resources, Floodplains, Water Quality, Air Quality, and Noise are largely devoid of analysis or information, and instead consist largely of conclusory statements.

164.   The FSA's draft EA contained numerous omissions and unsupported statements, as many members of the public pointed out in comments. Those problems persisted in the final EA, and included:

a)   Section 3 of the final EA ("Affected Environment and Impacts") listed sixteen sub-sections addressing different resource areas, such as wildlife and habitat, water quality, wetlands, and air quality. Ten of these resources were "eliminated from detailed analysis," often with conclusory and disjointed assertions.

b)   Wetlands were eliminated from detailed analysis because "there are no wetlands in the project area and the project would not result in discharge or fill in any wetlands." That assertion is in tension with information in the appendices to the final EA from the National Wetlands Inventory, which states that the location analyzed overlaps with three different wetlands. FSA made no attempt to explain this discrepancy.

165.   The environmental justice analysis in the final EA was also flawed. The October draft EA contained no environmental justice analysis, and the November draft EA contained only one paragraph of environmental justice analysis, which was carried over into the final EA with no revisions.

166.   As numerous commenters noted, the area around the Nguyen facilities is a majority Black farming community. By choosing an arbitrarily small input area of a one-mile radius, which ignores the local road geography, the FSA completely obscured the potential for impacts on environmental justice populations.

167.   One comment stated that "the area has four black churches; one Amish church, many active businesses and this embodies the future inheritance for many minority children," adding that the "area encompasses more minority landownership per acre than any other area in Henderson and possibly many other surrounding counties." The FSA ignored that comment, and many others related to environmental justice, entirely.

36

168.     Many comments from the public focused on air quality impacts, such as dander, odor, and particulate matter, and noted that ventilation systems employed by poultry houses are meant to protect flock health from the hazardous gases inside the houses, not prevent air pollution in the surrounding community. Commenters noted concerns that air pollution might negatively affect family members with respiratory problems and would generally affect the community's ability to enjoy outdoor church gatherings.

169.     Contrary to the purposes of NEPA, the final EA did not improve upon the draft, and did not address any of these concerns. FSA stated that "dust generated while the poultry facility is in operation would occur mostly during feeding," and that "humidity and misting systems inside poultry houses would minimize dust within the barns." Those statements by the FSA lack relevance because dust inside the barns is not a primary concern of nearby residents.

170.     FSA also asserted that "odor would be controlled through management of the poultry barns' ventilation systems as is required by integrators for flock health," and "applicants would dispose of mortalities according to their Best Management Practices."  The final EA did not describe the so-called "Best Management Practices," or how those practices would effectively control the odor and pollution concerns raised by local community members.

171.     The final EA admitted that "based on the climate of the Southeastern United States, there would be a few days in the year when weather conditions and humidity may cause odor to linger in the vicinity." However, the FSA further stated, without supporting information, that "[o]dor impacts would not be expected to be significant."

172.     FSA did not analyze any of the potential greenhouse gas emissions of the proposed facility, despite industrial animal agriculture being known to be a major source of greenhouse gas emissions.

173.     Enormous amounts of chicken feces, bedding, feathers, and decomposing chicken carcasses will be stored in an open-sided litter shed for months on end. The shed, combined with the industrial scale barns themselves, will be a significant source of noxious odors for neighboring residents, despite FSA's conclusory assertions to the contrary. As one commentor put it, "the storage of thousands of tons of litter and composting of dead birds is simply glossed over" by the FSA, without "any factual or even anecdotal evidence" to support the FSA's claim that odor would not be a significant problem.

174.     Members of the public also commented on the potential water quality impacts of the Nguyen facilities, and noted that in the draft EA, "[t]he issue of water pollution is simply dismissed as being of no significant impact." One comment noted that all the poultry litter will need to be applied to land, potentially over a very large area. The comment also noted that no surface waters are mentioned in the draft EA, even though there are surface waters near the facilities, such as Pigham Creek. The final EA did not correct that error.

175.     The draft and final EAs ignored the potential for stormwater runoff from the site itself (including the litter storage shed) or the potential cumulative or indirect impacts related to litter disposal.

176.     The final EA stated that, because the applicants have a nutrient management plan, and plan to export all litter off site, water impacts will not be significant. But neither plan is required for state or federal regulatory compliance—they appear to be voluntary, or perhaps required by the integrator, Tyson

177.     The final EA made zero effort to determine what will actually happen to millions of pounds of chicken feces, decomposing birds, feathers, and bedding material annually—where it will go, or whether it will be handled appropriately to prevent pollution of the air and water.

178.    FSA also completely failed to account for the cumulative impacts resulting from adding this facility to the several hundred other chicken houses built or planned to be built in the area. The Nguyen facilities are 16 houses out of the 560 Tyson has indicated are needed for the Humboldt slaughtering facility and the expansion of the Union City slaughtering facility. Each year, those chicken houses will collectively generate approximately *millions of pounds of chicken feces, decomposing birds, feathers, and bedding material*. But the EA did not consider cumulative impacts at all, even though the water quality implications of excessive animal waste in a watershed are well known to staff members at USDA.

179.    Based on unsupported, and in some cases clearly erroneous, assertions, FSA concluded that the proposed facility is not "a major Federal action significantly affecting the quality of the human environment."

B.    FSA failed to seriously consider alternatives.

180.    In the EA, FSA must also include "[a] discussion of alternatives, if the proposed action involves unresolved conflicts concerning the uses of available resources." 7 C.F.R. § 799.42(a). In the EA for the Nguyen facilities, FSA did not analyze any alternatives beyond the proposed action because Tyson would not be satisfied with any other configuration. FSA did not actually propose or set out any alternatives to be analyzed.

181.    In Section 2.3 of the EA (Alternative C), FSA simply stated that "[a]lternative locations would not be feasible, as the projects would take place on properties owned by the applicants." It followed on by asserting, without any explanation or justification, that "[t]he proposed sites would involve the least amount of ground disturbance and would have the least impact on surrounding properties."

182.    Stating that a proposed site configuration would have the "least impact on surrounding properties" requires, at minimum, two potential site configurations to compare. FSA did not examine any other potential configurations, and so this "analysis" appears to be no more than a bald assertion.

183.    FSA concluded its "analysis" of Alternative C by stating: "Alternative configurations were not considered due to the possibility of having a greater impact on the affected environment, but for integrated operations the farm owners/operators must comply with very specific logistical and design requirements." The meaning of this sentence appears to be: because Tyson requires that the site be designed and configured in a particular way, no other alternatives will be considered.

184.    The FSA's deference to Tyson's requirements is made even more apparent in Section 2.4 (Alternatives Considered but Eliminated from Analysis). There, FSA explained that "alternative designs of farm components are not considered as each producer's agreement with a poultry integrator requires adherence to the integrator's construction and equipment specifications, which are in place to ensure consistency, maximize production, and reduce loss. Design alternatives that would involve modification of features and infrastructure put in place by an integrator would jeopardize the availability of bird placement and be grounds for a potential loss of contract with the integrator, thus resulting in loss of viability of the farm. Accordingly, this alternative would not warrant further consideration." Allowing Tyson, a non-party to the loan, to dictate the scope alternatives renders the requirement for an alternatives analysis meaningless.

C.    FSA did not adequately evaluate actual mitigation measures, and improperly relied on unenforceable "mitigation measures" to create a no significant impacts finding.

185.    Both the Air Quality and Water Quality sections of the final EA demonstrate a pervasive issue in FSA's NEPA analysis: deferring to "integrator specifications" to justify finding

no significant impacts. FSA appears to assume that Tyson's requirements are designed to minimize environmental or community impacts, but it put forward no evidence for that assumption. FSA also appears to rely on Tyson requirements for their no significant impacts finding, even though there is no guarantee that Tyson requirements won't change over time, or that the Nguyens would be in compliance with those requirements.

186.    To the extent that FSA relies on Tyson requirements such as the "Nutrient Management Plans" ("NMPs") for the no significant impacts finding, FSA was required to make compliance with the NMPs an enforceable part of its loan approval as a mitigation measure. However, neither compliance with the NMPs nor any monitoring were part of the Conditional Commitments in the loan documentation. Because an NMP is not currently required under Tennessee law for dry-litter poultry operations like the Nguyen facilities, FSA cannot simply point to the Tennessee Department of Environment and Conservation as responsible for ensuring that any NMP provisions are followed.

187.    The other "mitigation measures" referenced in the FONSI fail to account for the many impacts of the facilities. FSA instead suggests that the state construction permits, which are meant to account for surface water impacts caused by construction activity, are sufficient to completely prevent water quality impacts resulting from the project. However, the state construction permits were not designed or intended for this purpose: they only account for stormwater runoff impacts *during construction*. This "mitigation measure" does nothing to account for the water quality impacts from the operation of the facilities—either runoff from the site itself during operation or resulting from the chicken waste being spread in the surrounding watershed.

188.    FSA had other options. It could have required site-specific plans to reduce the chance of water pollution by requiring a well-designed NMP that accounted for off-farm water

41

impacts and cumulative impacts and making compliance with that plan part of loan approval. It could have required windbreak buffers or air filters, to reduce the air impacts on the neighbors and community. FSA did not bother to even consider these options.

D. FSA did not provide adequate public notice of its environmental review.

189.    FSA published a Notice of Availability describing the Nguyen facilities in the Lexington Progress on October 20, 2021, indicating thirty days for public comment, and made the draft EA and underlying documents available at the Henderson/Decatur County FSA Office. However, the draft EA provided upon request contained numerous significant errors that were apparently the result of a hasty cut-and-paste operation.

190.    Although FSA eventually released a corrected draft, it did so the day the comment period was set to end, and failed to issue another public notice or to give notice about an extension or re-opening of the comment period. As a result, members of the public had little time to request, read, evaluate, and comment on the actual EA.

191.    FSA did not hold a public meeting, despite receiving 154 comments during the comment period, indicating a significant amount of controversy about the proposal among members of the public.

192.     FSA's failure to provide an actual draft of the EA in time for members of the public to thoroughly review prior to the close of the public comment period, and its failure to hold a public meeting despite significant controversy, violated FSA's own environmental review regulations related to public disclosure.

## FIRST CAUSE OF ACTION

## Violation of Con Act and APA
### (Failure to Comply with Statutory Requirement to Limit Loan Assistance to "Family Farms")

193.   Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

194.   The Con Act states that only individuals who are "or will become owner-operators of not larger than family farms" are eligible for loan assistance under the Act. 7 U.S.C.A. § 1922(a)(1). "Family farm" is defined in regulation as an agricultural operation in which "[t]he majority of day-to-day, operational decisions, and all strategic management decisions are made" and "[a] substantial amount of labor to operate the farm is provided by… [t]he borrower, with input and assistance allowed from persons who are either related to the borrower by blood or marriage, or are a relative, for an individual borrower." 7 C.F.R. § 761.2.

195.   Tyson, not the Nguyens, will make the majority of the "day-to-day, operational decisions, and all strategic management decisions." *Id.* Tyson controls nearly every aspect of the production process, including how and where the chicken houses are built and how the chicken houses are operated. Tyson owns the chicks and the chicken feed, and it imposes detailed and comprehensive operational requirements that govern how the industrial facilities will be operated. FSA had reason to know the extent of Tyson's control over the Nguyen operations, but nevertheless made the decision that the Nguyen facilities were "family farms," without any evidence that the Nguyens possessed sufficient control over the operations to qualify.

196.   FSA's decision to approve the loan guarantee despite the many indications that the Nguyen facilities will not be "family farms" is arbitrary, capricious, an abuse of discretion, or not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

43

## SECOND CAUSE OF ACTION

### Violation of Con Act and APA
**(Failure to Comply with Statutory Requirement to Limit Loan Assistance to Individuals Unable to Obtain Sufficient Credit Elsewhere)**

197.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

198.    The Con Act states that only individuals "unable to obtain sufficient credit elsewhere to finance their actual needs at reasonable rates and terms" are eligible for loan assistance from the FSA. 7 U.S.C.A. § 1922(a)(1).

199.    The Nguyens were demonstrably able to obtain outside credit without FSA assistance, as both Tyson and FCMA provided non-guaranteed loans to them. The FSA-guaranteed portion of their loans is only one-third the total amount of what is needed for construction. Despite this indication that the Nguyens could and did obtain outside credit, FSA nonetheless provided the loan guarantee with no actual review of whether outside credit was available.

200.    FSA's failure to undertake this required review is arbitrary, capricious, an abuse of discretion, or not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

### Violation of Con Act and APA
**(Failure to Comply with Statutory Requirement to Limit Loan Assistance to Maximum Amount)**

201.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

202.    FSA may only provide loan guarantees up to a maximum amount (at the time the Nguyens applied, $1,776,000). 7 C.F.R. § 761.8(a)(1).

203.    This amount was clearly not enough for the Nguyens to construct the sixteen (16) barns they desired. In addition to obtaining outside credit, the Nguyens also split up their operation

44

into two side-by-side operations, each containing eight barns. Both Dan and Trang Nguyen, through FCMA, applied for the maximum amount of FSA-guaranteed loans.

204.    This attempt to "split" the project into two in order to receive twice as much in guaranteed loans is contrary to the requirement that FSA loans only be guaranteed to a maximum amount. FSA knew that these facilities were essentially one project, which is why the FSA only performed one environmental assessment. Nevertheless, the FSA guaranteed both loans up to the maximum amount, as if they were genuinely two distinct projects.

205.    FSA's decision to permit the Nguyens to segment their project into two in order to receive more than the maximum amount of guaranteed loan funding is arbitrary, capricious, an abuse of discretion, or not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**

**Violation of NEPA and APA**
**(Failure to Comply with Public Notice Requirements)**

206.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

207.    FSA is required to "make environmental review available to the public through various means," such as by "publishing in a newspaper in the area of interest." 7 C.F.R. § 799.2. FSA should also "[m]ake appropriate environmental documents available to interested parties by request." 7 C.F.R. § 799.15. Additionally, FSA should consider holding a public meeting when "[t]here is substantial controversy concerning the environmental impact of the proposed action" or "substantial interest in holding a public meeting." 7 C.F.R. § 799.17.

208.    FSA initially released a draft EA that contained numerous basic factual errors, only releasing a revised EA in response to public requests. This revised EA was released the day the public comment period was set to end, and FSA refused to re-open the comment period or issue

another public notice on the updated draft EA. FSA also failed to hold a public meeting, despite receiving 154 comments during the comment period and needing to revise the draft it had initially released.

209.   FSA's failure to comply with its own regulations requiring it to make environmental review available to the public, and to consider holding a public meeting when there was significant controversy about the proposed action, was arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION

### Violation of NEPA and APA
### (Failure to Consider and Disclose Direct Effects)

210.   Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

211.   NEPA requires federal agencies to take a hard look at and fully disclose the environmental consequences of a proposed action. 42 U.S.C. § 4332. This includes consideration of direct impacts. *See* 7 C.F.R. § 799.42; § 799.53.

212.   The Nguyen poultry facilities are anticipated to house over 3 million Tyson chickens and produce millions of pounds of chicken litter (i.e. chicken feces, feathers, bedding material, and decomposing dead birds) annually. FSA's analysis in the final EA fails to identify several direct impacts of the Nguyen facilities.  Those impacts include noxious odor, air pollution, noise pollution, surface water impacts from stormwater runoff, impacts to groundwater, impacts on wetlands, and impacts to environmental justice communities.

213.   FSA's failure to consider and disclose direct impacts is arbitrary, capricious, an abuse of discretion, or not in accordance with NEPA and its implementing regulations. *See* 5 U.S.C. § 706(2)(A).

46

## SIXTH CAUSE OF ACTION

### Violation of NEPA and APA
### (Failure to Consider and Disclose Indirect and Cumulative Effects)

214.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

215.    NEPA requires federal agencies to take a hard look at and fully disclose the environmental consequences of a proposed action. *See* 42 U.S.C. § 4332. This includes consideration of indirect and cumulative impacts. *See* 7 C.F.R. § 799.42; § 799.53.

216.    The indirect and cumulative impacts include water pollution across the watersheds of Henderson County and surrounding counties, particularly for nitrogen, phosphorus, and pathogens, resulting from the spreading of millions of pounds of chicken feces and other waste. Other indirect and cumulative impacts include air quality impacts such as odor and particulate pollution, environmental justice impacts, and climate impacts from greenhouse gas emissions.

217.    FSA's failure to examine the indirect and cumulative effects of the Nguyen facilities is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its implementing regulations. 5 U.S.C. § 706(2)(A).

## SEVENTH CAUSE OF ACTION

### Violation of NEPA and APA
### (Failure to Consider Reasonable Alternatives)

218.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

219.    NEPA requires an analysis of alternatives to the proposed action. *See* 42 U.S.C. § 4332(E). FSA regulations require FSA to include "[a] discussion of alternatives, if the proposed

action involves unresolved conflicts concerning the uses of available resources" in an EA. 7 C.F.R. § 799.42(a)

220.    The EA failed to consider the no-action alternative as well as alternative designs for the proposed facility. Indeed, FSA asserted that design alternatives were not considered because the proposed design was required by the "producer's agreement with the poultry integrator," i.e. the contract with Tyson. EA 11. Because design alternatives would "be grounds for a potential loss of contract with the integrator," FSA stated that the alternative did "not warrant further consideration." *Id*.

221.    FSA may not abdicate its duty, as mandated by Congress, to consider alternatives simply because the "integrator" (Tyson) wouldn't approve. FSA's failure to consider any reasonable alternatives to the proposed Nguyen facilities is arbitrary, capricious, an abuse of discretion and not in accordance with NEPA and its implementing regulations. 5 U.S.C. § 706(2)(A).

### EIGHTH CAUSE OF ACTION

### Violation of NEPA and APA
### (Failure to Consider and Disclose Mitigation Measures)

222.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

223.    FSA NEPA regulations require FSA to include in an EA consideration of the "[l]ikelihood of any significant impact and potential mitigation measures that FSA will require, if needed, to support a FONSI." 7 C.F.R. § 799.42(a). If a FONSI "is conditioned upon the implementation of measures (mitigation actions) to ensure that impacts will be held to a nonsignificant level, the FONSI must include an enforceable commitment to implement such

measures on the part of FSA, and any applicant or other party responsible for implementing the measures will be responsible for the commitments outlined in the FONSI." 7 C.F.R. § 799.45(c).

224.    FSA's analysis in the EA did not include any apparent consideration of mitigation measures. The FONSI has a section titled "Mitigation Measures" that contains no reference to mitigation at all, instead referencing largely irrelevant state permits that did not address many of the most significant potential impacts.

225.    FSA's failure to consider and analyze the impacts and effectiveness of any mitigation measures for the Nguyen facilities is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its implementing regulations. 5 U.S.C. § 706(2)(A).

## NINTH CAUSE OF ACTION

### Violation of NEPA and APA
### (Failure to Prepare an EIS)

226.    Each allegation set forth in paragraphs 1 through 192 of this Complaint is hereby repeated and incorporated by reference as if fully set forth herein.

227.    NEPA requires the preparation of an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "An agency's decision not to prepare an EIS will be considered unreasonable if the agency failed to supply a convincing statement of reasons why potential effects are insignificant." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

228.    FSA's FONSI is grounded in an unconvincing recitation of why each of resource areas affected would not be significantly impacted by the proposed action. FSA did not once address several significance factors identified in the regulations, such as whether the project was "highly controversial." FSA received 154 comments on the draft EA, none of which were

49

responded to in the final EA or FONSI; there was clearly significant controversy. The agency's assertions are unsupported by the record.

229.    Accordingly, FSA's issuance of a FONSI and failure to prepare an EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its implementing regulations. 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Concerned Citizens respectfully requests that this Court:

1. declare that the Nguyen poultry facilities are not "family farms" eligible for loan guarantee assistance under the USDA's Farm Ownership Loan program;

2. vacate the guarantees issued by the FSA for loans made to Dan Nguyen and Trang Nguyen;

3. enjoin the spending of proceeds from loans to Dan Nguyen and Trang Nguyen guaranteed by the FSA;

4. enjoin the FSA from guaranteeing other loans to industrial scale poultry facilities controlled by Tyson;

5. vacate the FSA's Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") under NEPA;

6. enjoin the placement of chickens in the Nguyen poultry facilities until a thorough and complete environmental analysis, as required by NEPA, is performed;

7. order the Defendants to implement mitigation measures designed to protect surrounding community members and the environment from harm caused by the Nguyen poultry facilities;

8. award Concerned Citizens attorney fees and costs pursuant to 28 U.S.C. § 2412; and

9. grant such other relief as the Court deems just.

Respectfully submitted,

DATE: December 12, 2022

s/George Nolan
George Nolan, BPR#014974
Chelsea Bowling, BPR#037812
Southern Environmental Law Center
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
gnolan@selctn.org
cbowling@selctn.org

*Attorneys for Concerned Citizens of West Tennessee*